Jack E. Keene, Director Division of Central Services Department of Administration 1600 Sherman Street, Suite 1050 Denver, Colorado 80203
Dear Mr. Keene:
I am writing in response to your letter of November 8, 1985 to Duane Woodard in which you requested a legal opinion on the state's legal authority to accept Mastercard or Visa in payment of state goods. More specifically, your letter raises the following three questions:
QUESTIONS PRESENTED AND CONCLUSIONS
 1. Is there any statute or rule which prohibits the acceptance of Mastercard or Visa in payment of publications sold by Central Store?
 2. Is there any statute of rule which limits the amount of consideration to be paid by Central Services to these credit card companies for their services?
 3. Are there any taxes or tax collecting responsibilities attendant to the use of these credit cards?
There are no constitutional provisions, statutes, or rules which prohibit Central Store from accepting Mastercard or Visa in payment of publications which it sells. Moreover, while the procurement code generally requires Central Store to obtain the lowest price for services it purchases, there are no specific limits on the consideration it can pay for those services. Finally, Central Store is responsible for collecting state sales taxes which result from sale of publications to the public; but it incurs no tax liabilities for purchasing the services of a credit card company.
ANALYSIS
a. The mechanics of the credit card system.
By way of introduction, a representative of the Rocky Mountain Bankcard System gave the following outline of the mechanics of the credit card system: If the division decides to accept Mastercard or Visa in payment of state goods, an account must first be set up with a bank. Then the division, on a daily basis, would submit the invoices it collects to this account. Depending on the bank, the division's account is credited in the amount of the invoices either on the following business day or shortly thereafter. The credit card issuer is then responsible for collecting from the card holder. In consideration for this service, the credit card issuer will charge the division somewhere between 3-5 percent of the gross amount of monthly sales.
However, under certain circumstances the division's account can be debited. For example, if there is any dispute by the card holder regarding the product purchased the credit card issuer can charge back the purchase price to the division's account. In addition, disputes concerning lack of authorization to use the card will also result in a charge back.
2. Use of credit cards in payment of publications.
a.) State Statutes
The nature and extent of the division's powers and duties are set forth in sections 24-30-1101, C.R.S. (1985 Supp.). Among the powers vested with the division is the power to "contract for such services as the division may require." Section24-30-1105(1)(d), C.R.S. (1982). Because the division's contract with the credit card issuer is essentially one for services, this contract would come within the general authority granted under this section.
b.) Constitutional Provisions
A review of Colorado's constitutional provisions does not suggest any prohibition in the use of these credit cards. The only constitutional provision which appears to have any possible bearing on the division's use of credit cards is art. XI, § 1 which states:
 Neither the state, nor any county, city, town, township or school district shall lend or pledge the credit or faith thereof, directly or indirectly, in any manner to, or in aid of, any person, company or corporation, public or private, for any amount, or for any purpose whatever; or become responsible for any debt, contract or liability of any person, company or corporation, public or private, in or out of the state.
To some very minor extent, one could argue that credit is given by the division when a credit card is used in these purchases. The state does not actually receive payment until the day after the transaction is completed when its account is credited. Moreover, should a dispute arise concerning the transaction, the division's account would be debited resulting in what may be termed a credit sale — i.e., a sale where payment is "deferred" until the dispute is resolved.
However, in order for there to be a "lending of credit" in the constitutional sense, there must also be created a "debt" which obligates a future legislative appropriation to discharge the debt created by these transactions.
 When no debt or obligation of the state is created, the state cannot be said to have lent its credit in violation of article XI, section 1.
In Re Interrogatories by Colorado Senate, 193 Colo. 298,566 P.2d 350 (1977).
While the deferral of payment which occurs in the use of these credit cards may result in what is typically defined as credit, this deferral of payment does not impose any obligation on future legislative appropriations. Thus, no "debt" is created and no "lending of credit" in the constitutional sense is made.
Moreover, the deferrals of payment which occur with the use of these credit cards is very similar to those which occur when payment is made by check. Clearance of any check typically involves some deferral of payment. Section 4-3-506, C.R.S. (1973). So also, stop orders on checks as well as nonsufficient funds checks also result in a type of deferral in payment. However, given the wide spread practice of payment by check, it is unlikely that any court would hold that payment by check is an unconstitutional extension of credit. To the same extent, courts would not likely hold that payment by credit card is an unconstitutional extension of credit by the state.
2. Limitations on the amount of consideration.
The consideration given by the division to the credit card issuer of 3-5% of gross sales does not violate any statute or rule. There are no specific limits to the amount of consideration which the division can pay for services. The only limit applied to consideration to be paid under state contracts is that found under the procurement code which requires contracts be awarded to the lowest responsible bidder. Section 24-103-202, C.R.S. (1982).
3. Taxes.
With regard to the contract between the division and the credit card issuer, there are no taxes for which the division is liable. Under sections 39-26-114(1) and 206(1)(e), C.R.S. (1985 Supp.), the state is specifically exempted from all state sales and use taxes. There are no applicable federal taxes.
With regard to the purchases from the division by the purchaser, these transactions are taxable. Section 39-26-104(1), C.R.S. (1985 Supp.) provides a tax "on the purchase price paid or charged upon all sales and purchases of tangible personal property at retail." The state, as vendor, is liable for collection of this tax. Section 39-26-105(1)(a), C.R.S. (1985 Supp.). There are no applicable federal taxes on this transaction. Cf., 26 U.S.C. § 7211 (1967).
SUMMARY
4. Summary
In sum, there are no statutes or rules which prohibit Central Store's acceptance of such cards, nor limit the amount of consideration central stores can pay for these services. There are some tax collecting responsibilities of the state attendant to the sales by the Central Stores.
Very truly yours,
 DUANE WOODARD Attorney General
CREDIT CARDS PURCHASING TAXATION AND REVENUE STATE GOVERNMENT
Section 24-30-1105(1)(d), C.R.S. (1982)
Colo. Const. art. XI, § 21
ADMINISTRATION, DEPT. OF Central Services
The state may accept Mastercard and Visa in payment of state publications by private individuals.